UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KAREEM J. HOWELL, | Case No. 15-cv-05377-SI |
| Plaintiff, | |
| v. | **ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| C. TRAN, et al., | Re: Dkt. No. 44, 64 |
| Defendants. | |

**INTRODUCTION**

Kareem Howell filed this *pro se* prisoner's civil rights action under 42 U.S.C. § 1983. This action is now before the court for consideration of the motion for summary judgment filed by defendants and opposed by Howell. For the reasons discussed below, summary judgment will be granted and judgment entered in defendants' favor.

**BACKGROUND**

The following facts are undisputed unless otherwise noted:

The events and omissions giving rise to this action occurred in the period from July 16, 2015 through September 14, 2015, at the Santa Clara County Jail. At the relevant time, Howell was a prisoner of the State of California and had been transferred from a prison in Folsom to the jail for court proceedings. Docket No. 41 at 2. Also at the relevant time, the three defendants worked at the Santa Clara County Jail. Defendant Tran was a correctional officer working in the jail's mental health housing unit. Docket No. 11 at 2. Defendant Mahaffey was a correctional officer. *Id.* at 5. Defendant Meyers was a correctional lieutenant. *Id.* at 7.

Howell states that he "has a mental disorder and suffers from a frankly severe to extreme degree of psychiatric symptoms of his bipolar [a]ffective disorder condition." Docket No. 11 at 1. That information is from a July 30, 2014 declaration in support of renewal of involuntary medication, in which the psychiatrist also discussed Howell's many behavioral problems:

> The inmate has a history of significant verbal and physical aggression towards Custody Officers, other staff such as nurses and clinicians as well as towards other inmate [sic]. The patient-inmate has received multiple significant Rule Violation Reports related to his symptoms of his bipolar [a]ffective disorder over the course of the last 12 months. In the time interval of records I reviewed from 08/14/2013 through 07/06/2014 the patient-inmate had a total of 5 threats against staff, 4 batteries against staff, 3 indecent exposure and sexual misconduct charges and 3 charges of destruction of property. It is important to note that Mr. Howell patient [sic] was found guilty on all of these Rule Violation Reports. At times his threatening behavior towards Correctional Officers included graphic and detailed threats to gas Correctional Officers by exposing them to infectious bodily fluids in an involuntary fashion, to stab Correctional Officers in the neck, to murder the families of Correctional Officers.

Docket No. 40-1 at 4.

When Howell arrived at the jail on July 16, 2015, he was medically screened by medical staff and then placed in the maximum security housing unit. Docket No. 41 at 3; *see also* Docket No. 64-3 at 1-2. The Classification Unit[1] determined that Howell required maximum security housing based on, among other things, his criminal history and prison history, including his "highly assaultive acts against other inmates and staff while incarcerated," such as his five assaults on California state prison staff in the two years preceding his transfer to the jail. Docket No. 49 at 3. When Howell arrived at the jail, the mental health staff recommended that he be housed according to the Classification Unit's decision. *See id.* at 3-4. There is no evidence that any defendant was in the Classification Unit.

Howell was not given his psychiatric medications for several days after his arrival at the jail. *Id.* When he filed a grievance about the medications, he was informed that medical staff "'has to review your records from CDCR and verify your medications if you are prescribed any.'"

---

[1] At the jail, the Classification Unit determines the inmate's general housing placement. Docket No. 49 at 2. "The housing unit at the Main Jail for acute psychiatric care is known as '8A.' The Classification Unit makes no determination as to whether an inmate should be temporarily re-housed in 8A for acute psychiatric care." *Id.* at 3. Instead, the mental health staff is responsible for determining whether an inmate needs to be admitted into 8A, and the duration of the inmate's stay in 8A. *Id.*

2

Docket No. 41 at 3. His medications were restarted on July 19, 2015. Docket No. 64-3 at 18. There is no evidence that any defendant was responsible for Howell's medication.

As soon as he was housed in maximum security, Howell questioned his assignment and expressed his intent to get out of maximum security by smearing feces around his cell. Docket No. 49 at 3. The medical records contain numerous notations throughout Howell's stay at the jail of episodes of Howell smearing feces/urine in his cell, pushing feces/urine under the cell door, and threatening to throw urine and feces onto correctional staff (also referred to as "gassing" the staff). *See* Docket No. 64-3; *see also* Docket No. 48 at 3. The records also state that, shortly after his arrival, Howell put his clothes into the toilet to express his displeasure with having been housed in maximum security, and said he would continue doing so until he was rehoused. *See* Docket No. 64-3 at 12.

In the maximum security housing unit, Howell lived in a small cell, with a door with a window that looked out into a hall. Docket No. 61 at 2. He was allowed out of his cell for an hour every other day to another area for his recreation time; the other area also was a small room with a telephone and a toilet, with the door left open so the inmate could come and go to the adjacent shower. *Id.* Howell states that these conditions had a deleterious effect on his mental health, including causing anxiety attacks, depression, and suicidal and self-harm thoughts. *Id.* at 3.

1. Defendant Meyers

Howell filed grievances about his conditions and his perceived lack of adequate mental health care. Defendant Meyers reviewed the written complaints. Docket No. 41 at 3. Howell asserts that Meyers "turned a blind eye" to his grievances and "failed to get the plaintiff help, even after the plaintiff cut open both of his wrist[s] and documented that he was suicidal." *Id.* at 10.

Lieutenant Meyers' name can only be read on two inmate grievance forms. *See* Docket No. 11 at 23, 25. Both grievances were dated July 18, just two days after Howell arrived at the jail, and both complained about his housing. Lieutenant Meyers signed the forms as the facility

commander/designee and concurred in the responses already written by lower level staff members. On one grievance form, (a) the first responding officer wrote on July 18 that Classification had determined Howell's housing and a mental health technician had cleared him to return to his cell; and (b) a supervisor wrote on July 23 that "you were evaluated by mental health and not deemed to utilize [sic] a mental health housing. You're a max security inmate based on your behavior and prior custody history. Your housing designation is suitable for your behavior." Docket No. 11 at 23. On the grievance form, lieutenant Meyers concurred and wrote that "[m]ental health will continue to be available to you." *Id.* On the other grievance form, (a) the first responding officer wrote on July 18 that they were conducting 15-minute welfare checks, that a mental health tech had cleared Howell to return to his cell with no additional restrictions after interviewing him, and that his housing was determined by Classification and would be reviewed in 30 days; and (b) a supervisor wrote that "you were evaluated by mental health and not given a mental health housing location. You are a max security level inmate whose housing designation is suitable due to your behavior." *Id.* at 25. Lieutenant Meyers concurred with those responses. *Id.*

The medical records show that, on the day he wrote these two grievances, Howell was seen by a therapist, who noted that he was in a safety gown (i.e., a "Ferguson gown") and did "not appear to be a threat to self or others at this time." Docket No. 64-3 at 17. A clinician also had spoken with him one day earlier. *See id.* at 12.

2. Defendant Mahaffey

The parties disagree as to exactly what happened on September 1. Howell's version is that C/O Mahaffey came to Howell's cell and accused him of flushing extra clothes down the toilet. Docket No. 41 at 3. Howell denies that he smeared his feces around his cell on September 1. *Id.* Shortly thereafter, Howell began to have suicidal thoughts and informed Mahaffey of this, and Mahaffey told him to kill himself. *Id.* at 4. This caused Howell to become manic and to start "to have a psychotic reaction episode" that he thinks Mahaffey failed to recognize as a sign of mental illness. *Id.* Howell declares that, as he was asking for mental health attention, Mahaffey opened the food port and pepper sprayed him "directly into his face." *Id.* at 5. Howell states that he was

4

ordered to turn around and submit to handcuffs so he could be removed from his cell, and he complied with those "direct orders." *Id.* at 5.[2] Elsewhere he states that "no one never (ordered) plaintiff to cuff-up." Docket No. 61 at 8 (parentheses in source). Howell apparently draws a distinction between what he perceives as lawful direct orders, and other sorts of orders, but he does not fully explain his theory. Howell further states that he "did not resist, or threaten, or disobey any lawful orders." Docket No. 61-1 at 8. Mahaffey declares that he did not pepper spray Howell. Docket No. 46 at 2. Mahaffey declares that another member of the emergency response team that was assembled to remove Howell from his cell tried to apply pepper spray twice through the food port but Howell blocked it with his buttocks. *Id.*

After handcuffs were applied to him, Howell was removed from his cell and taken to another room in the jail. Howell declares that he was punched in the right eye, causing his eyeglasses to break. Docket No. 41 at 6. In one declaration he states he was punched by "someone" and in another declaration he states it was Mahaffey who punched him. *Compare* Docket No. 41 at 6 ("someone physically punched the plaintiff into his right eye"), *with* Docket No. 61-1 at 8 ("Mahaffey punched him in the face/eye"). He does not state how he knows it was Mahaffey who punched him. Mahaffey declares that he did not punch Howell. Docket No. 46 at 2.

The cell-extraction and transport of Howell were video-recorded. Although some of the actions are obscured by people blocking the view of the action, the video submitted to the court shows the following: First, in the video, Howell displayed no symptoms of having been hit with pepper spray in the facial area, i.e., his eyes were not watering, he made no attempt to rub his eyes or face with his hands in the time before the handcuffs were applied, he made no attempt to rub his eyes or face on his shoulders after he was in waist chains, he did not have a hoarse voice, and he did not cough, wheeze or spit. His orange jail uniform also did not appear to have any moisture

---

[2] Howell later received a rule infraction report for disobeying an order on September 1, 2015; he initially was found guilty, but the report was later dismissed by captain Hoyt. Howell states that he "was cleared of any wrongdoing on 9/15/2015." Docket No. 41 at 6. But the dismissal of the infraction report does not state, or even imply, that he was cleared of wrongdoing.

5

marks on it, as might have occurred if enough pepper spray had landed on the clothing. He does not mention having been pepper sprayed. Second, the video does not show anyone punching him and does show that he could not have seen who would have punched him if he had been punched. The video shows that Howell was made to walk in an unusual manner, apparently for maximum control by the escorting officers: Howell was bent over at a 90-degree angle at the waist, with his face facing the ground, and was walked backwards (with buttocks first) with several officers holding onto him throughout the walk. He was walked down a hall, onto an elevator, down another hall, and into another cell, where the handcuffs were removed and replaced with waist restraints. He then was locked in the new room with assurances that someone had requested medical staff to check on him. The video does not show anyone punching or hitting Howell. Indeed, at the place he claims he was punched and a punch supposedly can be heard (at minute 1:33 on the recording), *see* Docket No. 61 at 8, Howell is still bent over at a 90-degree angle and still wearing his glasses. An officer is holding his head with two hands to control him, and (at about minute 1:55), Howell's glasses are jostled and then fall off, while the officer is still holding Howell's head with two hands. A couple of that officer's fingers are in the area of Howell's face and may have resulted in him being poked in the eye, but the videotape does not show anyone punching Howell. Nor, contrary to Howell's assertion, is there the sound of him being punched. Third, the video has some statements by the officers and by Howell, most of which are self-serving, e.g., the officers repeatedly tell him to "comply" and he repeatedly tells them that he is "not resisting." During the video, Howell does say that an officer has punched him in the eye or face and requests medical care (at minutes 3:33, 3:40, 3:52). He also states that he had refused to come out of his cell because an "officer threatened to kill me" (at minute 4:05). He also complains that someone is twisting his wrist as they are changing the handcuffs -- "because I just want to get it on the videotape" (at minute 4:25).

The medical records show that Howell was checked by a nurse on September 1, 2015 after he was placed in the new cell. The record states that the inmate had complained of arm and wrist pain, and had hit his head; pepper-spray exposure is not mentioned. Docket No. 64-3 at 56. The record also states "no swelling to head noted, no redness." *Id.* The medical records also show that

6

Howell was seen about an hour later by a nurse for a medical clearance after he had been placed in a restraint chair. That record states: "Safety cell flowsheet initiated and completed at this time. Pt. very agitated and angry. Verbally threatening Deputy Correctional Officers while being cleared by medical staff." Docket No. 64-3 at 59. The records indicate that Howell was released from the restraint chair in about two hours. *Id.* at 60. Howell also was evaluated by therapists twice on September 2, 2015, according to the records. *Id.* at 63, 67.

Howell was admitted into Unit 8A, the jail's psychiatric ward, on September 4, 2015, according to the medical records. Docket No. 64-3 at 73, 83. He remained there for almost two weeks. Docket No. 64-3 at 73, 83-86.

### 3. Defendant Tran

The parties agree that C/O Tran refused to feed Howell his breakfast on September 14, 2015. Docket No. 41 at 7; Docket No. 48 at 2. They disagree as to the circumstances surrounding the absence of a breakfast that day.

Howell declares that he told Tran that he needed to eat because he was not supposed to take his morning medications on an empty stomach. Docket No. 41 at 7. Tran responded, "'oh well.'" *Id.* Howell declares that he "did not throw any feces and/or urine under his cell door or at anyone." *Id.* Howell did take his psychiatric medications on an empty stomach that morning, *id.*, and there is no evidence that he suffered any harm as a result. *Id.* Howell attempted to report C/O Tran's treatment of him, and Tran told him to shut up. *Id.* at 7-8.[3]

Howell also declares that, later on September 14, Tran denied Howell's request to speak to lieutenant Meyers. Tran walked away, but returned seconds later with a roll of duct tape and "proceeded to tape off the cracks around the outside of the plaintiff's cell door," which prevented

---

[3] C/O Tran declares that he did not provide a breakfast to Howell on September 14 because of the unsanitary condition of Howell's cell. According to Tran, Howell had collected his feces and urine and attempted to "gas" officers by launching his body waste at them under the cell door. Howell also had tried to spit on officers. Docket No. 48 at 2. At the summary judgment stage, this court must accept as true the non-movant's version of events and therefore accepts Howell's version.

Howell's voice from being heard outside his cell. *Id.* at 8. Tran then used a bed sheet to cover the window of the cell door, blocking Howell's view of the area outside his cell. *Id.* This caused Howell to have a "psy-reaction manic attack" that he claims went untreated. *Id.* at 10.

The medical records for September 14 and later show the following: Howell was housed in Unit 8A (the acute psychiatric unit) and was being medicated; a doctor evaluated him on September 14; a team meeting was held on September 17, and the plan was to continue assessment and observation of the patient; Howell was evaluated by doctors on September 18, 20 and 21; and a therapist evaluated him on September 20. Docket No. 64-3 at 97-103, 159-171. Howell also was assessed by nurses every day during his stay in Unit 8A from September 4 through September 20, who made notes of his behavior each day and their occasional conversations with Howell. *Id.* at 110-152.

Defendants have submitted a declaration from Michael Meade, M.D., a physician certified by the American Board of Psychiatry and Neurology and a qualified medical examiner with the State of California. Docket No. 48 at 1. Dr. Meade reviewed and analyzed all of the medical records from Santa Clara County Adult Custody Mental Health Services and concluded that Howell "received medically acceptable mental health treatment" at the jail and "was routinely visited and evaluated by [mental health services] staff, including doctors, nurses, and other mental health staff." *Id.* at 2, 3. Dr. Meade also declared that the mental health services records demonstrated that Howell "from time to time demonstrated volitional behaviors and/or voiced unverified subjective complaints in an effort to alter his housing assignments." *Id.* at 3.

**VENUE AND JURISDICTION**

Venue is proper in the Northern District of California under 28 U.S.C. § 1391 because the events or omissions giving rise to the complaint occurred in Santa Clara County, located in the Northern District. *See* 28 U.S.C. §§ 84, 1391(b). This court has federal question jurisdiction over this action under 42 U.S.C. § 1983. *See* 28 U.S.C. § 1331.

**LEGAL STANDARD**

Summary judgment is proper where the pleadings, discovery, and affidavits show that there is "no genuine dispute as to any material fact and [that] the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A court will grant summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial . . . since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). A fact is material if it might affect the outcome of the suit under governing law, and a dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Generally, as is the situation with defendants' challenge to the Eighth Amendment claims, the moving party bears the initial burden of identifying those portions of the record which demonstrate the absence of a genuine issue of material fact. The burden then shifts to the nonmoving party to "go beyond the pleadings, and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324.

When a defendant moves for summary judgment on an affirmative defense on which he bears the burden of proof at trial, he must come forward with evidence which would entitle him to a directed verdict if the evidence went uncontroverted at trial. *See Houghton v. South*, 965 F.2d 1532, 1536 (9th Cir. 1992).

The court's function on a summary judgment motion is not to make credibility determinations or weigh conflicting evidence with respect to a disputed material fact. *See T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). The evidence must be viewed in the light most favorable to the nonmoving party, and the inferences to be drawn from the facts must be viewed in a light most favorable to the nonmoving party. *See id.* at 631.

9

A verified complaint may be used as an opposing affidavit under Rule 56, as long as it is based on personal knowledge and sets forth specific facts admissible in evidence. *See Schroeder v. McDonald*, 55 F.3d 454, 460 & nn.10-11 (9th Cir. 1995) (treating plaintiff's verified complaint as opposing affidavit where, even though verification not in conformity with 28 U.S.C. § 1746, plaintiff stated under penalty of perjury that contents were true and correct, and allegations were not based purely on his belief but on his personal knowledge). Howell's second amended complaint was made under penalty of perjury and therefore will be considered as part of his opposition to the motion for summary judgment.

**DISCUSSION**

In the order of service, the court found that, liberally construed, the second amended complaint stated cognizable claims: (1) against lieutenant Meyers for deliberate indifference to Howell's mental health needs for his responses to Howell's grievances that concerned the alleged neglect of Howell's mental health needs; (2) against C/O Tran for deliberate indifference to Howell's mental health needs on September 14, 2015; (3) against C/O Mahaffey for deliberate indifference to Howell's mental health needs on September 1, 2015; and (4) against C/O Mahaffey for excessive force on September 1, 2015. *See* Docket No. 13.

A.  Mental Health Care Claims

Deliberate indifference to an inmate's serious medical needs violates the Eighth Amendment's proscription against cruel and unusual punishment. *See Estelle v. Gamble*, 429 U.S. 97, 104 (1976); *Toguchi v. Chung*, 391 F.3d 1051, 1057 (9th Cir. 2004). To establish an Eighth Amendment claim on a condition of confinement, such as medical care, a prisoner-plaintiff must show: (1) an objectively, sufficiently serious, deprivation, and (2) the official was, subjectively, deliberately indifferent to the inmate's health or safety. *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994). These two requirements are known as the objective and subjective prongs of an Eighth Amendment deliberate indifference claim.

To satisfy the objective prong, there must be a "serious" medical need. A serious medical need exists if the failure to treat an inmate's condition "could result in further significant injury" or the "'unnecessary and wanton infliction of pain.'" *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006).

For the subjective prong, there must be deliberate indifference. A defendant is deliberately indifferent if he knows that an inmate faces a substantial risk of serious harm and disregards that risk by failing to take reasonable steps to abate it. *Farmer*, 511 U.S. at 837. The defendant must not only "be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," but he "must also draw the inference." *Id.* Deliberate indifference may be demonstrated when prison officials deny, delay or intentionally interfere with medical treatment, or it may be inferred from the way in which prison officials provide medical care. *See McGuckin v. Smith*, 974 F.2d 1050, 1062 (9th Cir. 1992) (finding that a delay of seven months in providing medical care during which a medical condition was left virtually untreated and plaintiff was forced to endure "unnecessary pain" sufficient to present colorable § 1983 claim), *overruled on other grounds by WMX Techs., Inc. v. Miller*, 104 F.3d 1133, 1136 (9th Cir. 1997) (*en banc*). There must be "harm caused by the indifference," although the harm does not need to be substantial. *See Jett*, 439 F.3d at 1096.

A mere difference of opinion as to which medically acceptable course of treatment should be followed does not establish deliberate indifference. *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989) (summary judgment for defendants was properly granted because plaintiff's evidence that a doctor told him surgery was necessary to treat his recurring abscesses showed only a difference of opinion as to proper course of care where prison medical staff treated his recurring abscesses with medicines and hot packs). "[T]o prevail on a claim involving choices between alternative courses of treatment, a prisoner must show that the chosen course of treatment 'was medically unacceptable under the circumstances,' and was chosen 'in conscious disregard of an excessive risk to [the prisoner's] health.'" *Toguchi*, 391 F.3d at 1058 (second alteration in original).

11

The case of *Cano v. Taylor*, 739 F.3d 1214 (9th Cir. 2014), is very similar to the present case. In *Cano*, the prisoner claimed that he had not received proper care for his mental illness, with the result that he became suicidal. The Ninth Circuit upheld summary judgment for the defendants because of the ample evidence that Cano had received mental health care. There were prison health care records showing that Cano was seen by mental health care employees regularly for his complaints, e.g., evidence of numerous visits by psychologists and psychiatrists over a 3-year period, "a great deal of evidence that his suicide threats were manipulative in nature," and evidence that "during follow-up visits to his cell, Cano's chief complaint was boredom, and he sought a television and radio in his cell." *Id.* at 1217-18. The record also disclosed that Cano was an uncooperative and difficult patient, and that the violent and threatening behavior he often exhibited meant that he could not be placed in a lower custody part of the prison. *Id.* at 1218. There also were "countless forms in the record demonstrating follow-up by staff, including cell-front visits to check on Cano's mood, continuous progress reports, psychiatric follow-ups, mental health treatment plans, and watch discharge summaries." *Id.* The Ninth Circuit concluded that, on this record, no reasonable trier of fact could find that there was deliberate indifference to Cano's complaints about his mental health needs. *Id.*

As in *Cano*, the hefty pile of medical records -- 180+ pages of records generated in just a two-month stay -- shows that Howell received numerous evaluations by doctors, therapists and nurses, and received medications throughout his stay at the jail. As in *Cano*, the records show that Howell had a history of violent and threatening behavior, before arriving at the jail and during his stay at the jail, which led to more restrictive housing than the inmate preferred. Also as in *Cano*, the records show that jail mental health and custody staff thought some of Howell's suicide threats were manipulative in nature.

On the evidence in the record, defendants are entitled to summary judgment on Howell's claims that they were deliberately indifferent to his mental health needs. The evidence in the record suffices to allow a jury to conclude that Howell's mental health problems presented a serious medical need. Not so for the subjective prong. Even viewed in the light most favorable to Howell, the evidence in the record does not suffice to allow a rational jury to conclude that

12

members of the jail staff were deliberately indifferent to Howell's mental health care needs. That evidence shows the following: Howell received a medical evaluation upon his arrival at the jail, at which time the evaluator noted his mental health problems and cleared him for placement per the Classification Unit's decision. After a delay of a few days after his arrival during which medical staff was reconciling his medications -- i.e., he missed dosages on July 16, 17 and 18 -- Howell received psychotropic medications for the entirety of his stay at the jail. The mental health staff did not note any need to house Howell in the jail's mental health unit when he transferred to the jail from a prison and recommended that he be housed pursuant to the decision of the Classification Unit. During his stay at the jail, Howell had numerous evaluations by doctors (at least some of whom were psychiatrists) and therapists. Howell was placed in Unit 8A on September 4, when it was determined by mental health staff that he satisfied the criteria for a psychiatric hold under California Welfare & Institutions Code section 5150. During Howell's two-week stay in Unit 8A, his mental health was observed and assessed on a daily basis by nurses. Howell also was evaluated by doctors and therapists during his stay in Unit 8A. And Howell offers no competent evidence to dispute the psychiatrist's expert opinion that Howell received medically acceptable mental health treatment at the jail.

Howell contends that his jailers delayed, denied and provided inadequate mental health care. But on the record before the court, no rational jury could find an Eighth Amendment violation. Ultimately, Howell has managed only to show a difference of opinion about the adequacy of the mental health care treatment he received at the jail. Showing only a difference of opinion does not allow him to withstand defendants' motion for summary judgment on his Eighth Amendment claim. *See Toguchi*, 391 F.3d at 1058; *Sanchez*, 891 F.2d at 242.

As to each of the three defendants, Howell has failed to show a genuine issue for trial. Howell has failed to show a genuine issue for trial in support of his claim that lieutenant Meyers was deliberately indifferent to Howell's mental health needs in the way Meyers handled Howell's inmate grievances. The evidence shows that, at the time Howell was filing those grievances complaining of inadequate mental health care and a wish to be moved to less restrictive housing for the betterment of his mental health, Howell's mental health needs were being addressed by the

mental health staff. It is undisputed that the inmate grievance responses in which lieutenant Meyers concurred had explained to Howell that his housing had been determined after mental health staff had determined he did not require special mental health housing and could be housed per the decision of the Classification Unit, and that the Classification Unit decided that he belonged in maximum security housing. Lieutenant Meyers also explained on the form that mental health would continue to be available to Howell in his current housing location. While Howell may have shown that he did not get the response he wanted from lieutenant Meyers, he has not provided evidence that would allow a reasonable trier of fact to conclude that lieutenant Meyers' responses amounted to deliberate indifference to his mental health needs.

Howell also has failed to show a genuine issue for trial in support of his claim that C/O Mahaffey was deliberately indifferent to Howell's mental health needs on September 1 or his claim that C/O Tran was deliberately indifferent to Howell's mental health needs on September 14. Although neither of these correctional officers ran to immediately summon a psychiatrist when Howell requested mental health care, the record plainly shows that Howell received mental health care on September 1 and 14, as well as on the ensuing days. *See, e.g.,* Docket No. 64-3 at 55-62 (medical records for September 1 showing medical evaluation and later welfare checks), 63-64 (therapist's notes for September 2), 97, 100-103 (psychiatrists' progress note for September 14, 20 and 21), 130 (nurse assessment notes for September 14). The record also shows that, although Howell denies that he was engaged in the misbehavior of which he was accused, both correctional officers were responding to reports of behavioral problems by Howell. *See* Docket No. 45 at 2; Docket No. 46 at 2. That each officer chose to deal first with the reported behavioral problems of Howell does not show that there was deliberate indifference to his mental health needs, given the evidence that he received mental health care on the days of these events. Indeed, the September 14 incident occurred while Howell was already in Unit 8A under closer observation by mental health care providers.

B. Qualified Immunity

The defense of qualified immunity protects "government officials . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The doctrine of qualified immunity attempts to balance two important and sometimes competing interests: "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).

To determine whether a government official is entitled to qualified immunity, courts must consider (1) whether the official's conduct violated a constitutional right, and (2) whether that right was "clearly established" at the time of the alleged misconduct. *Pearson*, 555 U.S. at 232. Courts may "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id*. at 236. "An officer cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in [his] shoes would have understood that he was violating it, meaning that existing precedent . . . placed the statutory or constitutional question beyond debate." *City and County of San Francisco, Cal. v. Sheehan*, 135 S. Ct. 1765, 1774 (2015) (alteration and omission in original) (citation omitted). This is an "exacting standard" which "gives government officials breathing room to make reasonable but mistaken judgments by protect[ing] all but the plainly incompetent or those who knowingly violate the law." *Id.* (alteration in original) (internal quotation marks omitted).

For an Eighth Amendment violation based on a condition of confinement (such as a mental health care need), the official must *subjectively* have a sufficiently culpable state of mind, i.e., he "'must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.' Thus, a reasonable prison official understanding that he cannot recklessly disregard a substantial risk of serious harm, could know all of the facts yet mistakenly, but reasonably, perceive that the exposure in any given situation was not that high. In these circumstances, he would be entitled to qualified immunity." *Estate of Ford v. Ramirez-Palmer*, 301 F.3d 1043, 1050 (9th Cir. 2002) (quoting *Farmer v. Brennan*, 511

15

1 U.S. at 834, and citing *Saucier v. Katz*, 533 U.S. 194, 205 (2001)). Although the general rule of deliberate indifference had been expressed in *Farmer*, no authorities had "fleshed out 'at what point a risk of inmate assault becomes sufficiently substantial for Eighth Amendment purposes.'" *Estate of Ford*, 301 F.3d at 1051 (quoting *Farmer*, 511 U.S. at 834 n.3). Because it had not been fleshed out, "it would not be clear to a reasonable prison official when the risk of harm from double-celling psychiatric inmates with one another changes from being *a* risk of *some* harm to a *substantial* risk of *serious* harm. *Farmer* left that an open issue. This necessarily informs 'the dispositive question' of whether it would be clear to reasonable correctional officers that their conduct was unlawful in the circumstances that [they] confronted." *Estate of Ford*, 301 F.3d at 1051. Each of the defendants in *Ford* was entitled to qualified immunity even though he was aware of some information that there was *some* risk in double-celling the violent inmate with the decedent or any other inmate.

As in *Estate of Ford*, the present case involves a situation where the general Eighth Amendment duty is well-known but the particular obligations for correctional staff in certain situations are open for debate. There is caselaw that unnecessary delay in providing medical care may amount to deliberate indifference, *see, e.g., McGuckin*, 974 F.2d at 1062, but the cases have not fleshed out just how quickly an officer must summon mental health care staff when an inmate requests mental health care. Nor have the cases fleshed out the requirements for prioritizing requests for mental health care when the inmate is at the time engaged in misbehavior that may or may not be a product of his mental illness.

Here, all three defendants are entitled to qualified immunity against the deliberate indifference claim. For each of the defendants, the evidence in the record does not establish a violation of Howell's Eighth Amendment rights in their responses to his request for different housing and mental health care. The defendants prevail on the first prong of the *Saucier* analysis. Even if a constitutional violation had been shown, however, the defendants would prevail on the second prong of the *Saucier* analysis. A reasonable officer in lieutenant Meyer's position would not have understood that it would be unlawful to leave an inmate in maximum security housing when he was aware that the inmate was receiving mental health care in the maximum security unit

16

and that the inmate had been cleared for regular housing by the mental health staff. A reasonable officer in the position of C/O Meyers and C/O Tran would not have understood that it would be unlawful to deal with reported unsanitary behavioral problems by the inmate before summoning mental health care, when that officer was aware that the inmate was receiving ongoing mental health care at the jail. The defendants are entitled to judgment as a matter of law on the qualified immunity defense for these claims.

C. Excessive Force Claim

The treatment an inmate receives in custody and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment. *Helling v. McKinney*, 509 U.S. 25, 31 (1993). Whenever prison officials stand accused of using excessive force in violation of the Eighth Amendment, the core judicial inquiry is whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm. *Hudson v. McMillian*, 503 U.S. 1, 6-7 (1992); *Jeffers v. Gomez*, 267 F.3d 895, 912-13 (9th Cir. 2001) (applying "malicious and sadistic" standard to claim that prison guards used excessive force when attempting to quell a prison riot). In determining whether the use of force was for the purpose of maintaining or restoring discipline, or for the malicious and sadistic purpose of causing harm, a court may evaluate the need for application of force, the relationship between that need and the amount of force used, the extent of any injury inflicted, the threat reasonably perceived by the responsible officials, and any efforts made to temper the severity of a forceful response. *Hudson*, 503 U.S. at 7; *LeMaire v. Maass*, 12 F.3d 1444, 1454 (9th Cir. 1993); *see also Spain v. Procunier*, 600 F.2d 189, 195 (9th Cir. 1979) (guards may use force only in proportion to need in each situation).

"When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380-83 (2007) (police officer entitled to summary judgment based on qualified immunity in light of video evidence capturing plaintiff's reckless driving in attempting to evade capture which

17

utterly discredits plaintiff's claim that there was little or no actual threat to innocent bystanders); *cf. Cruz v. City of Anaheim*, 765 F.3d 1076, 1080 (9th Cir. 2014) (police officers not entitled to summary judgment in a fatal shooting that involved "curious and material factual discrepancies," including the fact that the victim did not have a gun on him and was still suspended by his seat belt when he was shot, which is inconsistent with the officers' assertion that they saw the victim reach for a gun; based on these disputed facts, it was for a jury to decide whether or not to believe the testimony of the four shooting officers and to consider other circumstantial evidence that would tend to discredit their version of events).

This is a case in which the videotape blatantly contradicts Howell's version of events, such that no reasonable jury could find in his favor on his excessive force claim. Mindful that the *Scott* rule is to be used with great caution, the court believes that this is an appropriate case in which to use it because the video tells a story wholly at odds with the version Howell offers. Although the video is not a perfect record because the view is occasionally obstructed by guards moving between the camera and Howell, the video has some very critical information. With regard to the alleged pepper spray to the face, the video plainly shows that Howell did not look or sound like someone who has been pepper sprayed. The video shows that Howell did not exhibit any of the symptoms usually seen after one is exposed to pepper spray, especially after one is sprayed in the face: Howell did not display watering eyes, made no attempt to rub his eyes or face in the time before the handcuffs were applied, did not have a hoarse voice, and did not cough, wheeze or spit. He did not mention during the video that he had been pepper sprayed. The videotape utterly discredits Howell's assertion that he was pepper sprayed in the face. Moreover, the medical form completed by the nurse who evaluated him after he was removed from his cell also does not mention anything about pepper-spray exposure or any need for decontamination. After viewing the video and medical evaluation, no reasonable trier of fact could conclude that Mahaffey had pepper sprayed Howell in the face.

With regard to the claim that Howell was punched by Mahaffey, the videotape so blatantly contradicts Howell's version of events that no rational jury could find that Mahaffey punched Howell in the face. The video plainly shows that Howell was not in a position to see who punched

18

1 him, if he was punched at all. He was handcuffed and bent over at a 90-degree angle at the waist, with his head held facing downward toward the floor. From his position, he could see the floor and the correctional officers' footwear and perhaps as high as their knees. But the video clearly shows he was not in a position to observe who was doing what to him as he was moved from one cell to another. In short, even if he had been punched, the video shows that he could not have seen who did the punching. Moreover, the video shows the moment when his glasses fall off his face, and that occurs about twenty seconds after he allegedly was punched with such force that his glasses were broken. The video shows that the eyeglasses fall off when they are jostled by an officer who is holding Howell's head in his hands and some of the officer's fingers are near to Howell's eye. Finally, even Howell seems to have doubt as to who punched him -- as in one place he declares that it was "someone" and in another place he declares that it was Mahaffey. After viewing that video, no reasonable trier of fact could conclude that Mahaffey punched Howell in the face while Howell was transported from one cell to another cell.

When the evidence is viewed in the light most favorable to Howell, and inferences therefrom drawn in his favor, a reasonable jury could not find that defendant C/O Mahaffey used excessive force on Howell. C/O Mahaffey therefore is entitled to judgment as a matter of law on this claim.

Finally, because Howell fails to present evidence that would allow a rational trier of fact to conclude that he had been subjected to excessive force by Mahaffey, Mahaffey also is entitled to summary judgment in his favor on the defense of qualified immunity. *See Saucier*, 533 U.S. at 201 (threshold question in qualified immunity analysis is: "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?").

## CONCLUSION

Defendants' motion for summary judgment is GRANTED. Docket No. 44. Defendants are entitled to judgment as a matter of law on plaintiff's complaint.

Defendants' motion to file Howell's mental health records under seal is GRANTED. Docket No. 64. Docket No. 64-3 is filed under seal. See Local Rule 79-5.

The clerk shall close the file.

**IT IS SO ORDERED**.

Dated: February 26, 2018

_____
SUSAN ILLSTON
United States District Judge